O
JS-6

# United States District Court
# Central District of California

| | |
|---|---|
| LEO DAVID,<br><br>               Plaintiff,<br><br>    v.<br><br>UNITED AIRLINES, INC., and DOES 1–10, inclusive,<br><br>               Defendants. | Case № 2:15-cv-02262-ODW (PJWx)<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [20]** |

## I. INTRODUCTION

Plaintiff Leo David claims Defendant United Airlines, Inc. ("UAL") acted negligently and breached its contract of carriage when the airline downgraded Plaintiff from BusinessFirst (first class) to Economy Premier/Plus (economy, or coach, class) on an international flight. As a result of the downgrade and UAL's inability to provide immediate accommodations for Plaintiff's pre-existing medical condition, Plaintiff allegedly suffered bodily injuries.

Defendants' Motion for Summary Judgment is now before the Court for consideration. (Def. Mot. for Summ. J. ("Mot."), ECF No. 20.) The airline argues that Plaintiff's state law claims are wholly preempted by the Montreal Convention. For the foregoing reasons, the Court agrees that the Montreal Convention applies and preempts the state contract and tort claims, and thus **GRANTS** the Motion in its entirety.

## II. FACTUAL BACKGROUND

Plaintiff is an eighty-six year old gentleman who, in 2013, was invited to attend the Maccabiah Games in Israel as an esteemed guest of Israeli government officials. (Leo David ("David") Decl. ¶¶ 2–3, ECF No. 23-3.) With the 600,000 points accumulated on his American Express card, Plaintiff purchased two first class roundtrip flights from Los Angeles, California to Tel Aviv, Israel, with a layover in Newark, New Jersey. (Deema Fleming ("Fleming") Decl. ¶ 8, ECF No. 20-7; Pl.'s Passenger Ticket 2, Fleming Decl. Ex. B, ECF No. 20-9.)[1] Plaintiff purchased tickets

---

[1] The Court overrules Plaintiff's objection that UAL employee Deema Fleming cannot authenticate Plaintiff's Passenger Ticket because she is only "generally" familiar with this record. (Pl.'s Evid. Obj. 3, ECF No. 23-2.) However, to prove the authenticity of a business record, a declarant does not need personal knowledge of the contents of the specific record nor the time, place, and manner in which the record was made. *United States v. Sand*, 541 F.2d 1370, 1377 (9th Cir. 1976). Fleming's declaration properly authenticates the record; she states that she acquired knowledge of the policies and procedures related to passenger reservations, special accommodations, and the mileage award program over her eighteen years of service with UAL. (Fleming Decl. ¶¶ 1–2.) The Court accepts evidence of Fleming's long career with UAL as a means of authenticating a document she has seen

for himself and Samuel Licker, a student journalist whom Plaintiff personally invited to provide coverage of the games for a local TV channel. (David Decl. ¶ 3; Pl.'s Resp. to Def.'s Interrog. Nos. 7–8, Lazenby Decl., Ex. C, ECF No. 20-5.) After the mileage deduction, Plaintiff paid $49.07 out of pocket for each ticket. (UAL Passenger Name Record 5, Fleming Decl. Ex. A, ECF No. 20-8.)[2] The connecting flight to Tel Aviv featured BusinessFirst and economy classes of service. (Fleming Decl. ¶ 13.) The economy section also included Economy Premier/Plus seats that offered extended legroom in the economy cabin.[3] (*Id.*)

### A. The Seat Downgrade

On July 14, 2013, Plaintiff and his companion flew first class from Los Angeles to Newark without incident. (Leo David Dep. ("David Dep.") 57:17–19, Lazenby Decl. Ex. D, ECF No. 20-6.) The flight landed in Newark at 9:45 p.m. and the connecting flight to Tel Aviv was scheduled to depart at 10:45 p.m. (*Id.* 48:17–19, 49:4–11.) Just as Plaintiff was about to board the flight to Tel Aviv, the gate agent informed him that, due to an insufficient number of BusinessFirst seats, Plaintiff and Licker were downgraded to Economy Premier/Plus. (Compl. ¶ 5, Not. Of Removal, Ex. 2, ECF No. 1.) In response, Plaintiff objected to the downgrade and informed the agent that he suffered from edema, a health condition that would cause his legs to swell up with fluid if he could not extend his legs during the flight. (*Id.* ¶ 7). He then

---

countless times over her nearly two decades of service, and thus accepts Plaintiff's passenger tickets as admissible evidence.
[2] Plaintiff's objection to the Passenger Name Record's lack of authentication is likewise overruled. (Pl.'s Evid. Obj. 2; *see supra* note 1.)
[3] The Court overrules Plaintiff's objection that Fleming lacks personal knowledge of the actual conditions Plaintiff faced during the flight because the phrases "extended legroom" and "premium seats" are not legally defined with dimensions. (Pl.'s Evid. Obj. 1–2.) It is undisputed that there is no legal standard for industry terms defining the classes of seats among airlines. (Def.'s Resp. to Pl.'s Statement of Undisputed Material Facts ("UMF Resp.") 3, ECF No. 24-2.) However, personal knowledge of actual seat dimensions is not necessary to determine whether an "accident" caused Plaintiff's injury. The Court agrees with Defendant that the industry terms characterized the seats to the extent necessary to demonstrate that Plaintiff was downgraded to a class of service with less leg room than first class and more legroom than regular economy.

1 requested that the airline rebook their tickets for first class seats on another flight,
2 either that day or the following day, operated by UAL or a different airline. (David
3 Decl. ¶ 9.) The gate agent checked the availability of other flights to Tel Aviv, but no
4 first class seats were available that night or the next day. (Lazenby Decl. ¶ 15.) He
5 then asked the gate agent whether he could pay a passenger already occupying a
6 BusinessFirst seat twice the original amount. (David Decl. ¶ 10.) Although the agent
7 did not communicate his offer to the passengers (Lazenby Decl. ¶ 15), Plaintiff also
8 did not directly ask passengers already seated in BusinessFirst to exchange seats in
9 return for compensation. (UMF Resp. 5.) Moreover, Plaintiff did not personally
10 pursue other viable options, such as searching for alternative flights online,
11 summoning his private jet,[4] or returning to Los Angeles and flying at a later date.
12 (David Dep. 75:17–24, 79:14–23, 141:1–8.) Faced with the decision to accept the
13 downgrade and arrive in Israel on schedule or not, Plaintiff knowingly chose to board
14 the aircraft. (Compl. ¶ 5.) He also submits that he was "angry," "upset," and
15 "probably" irrational when he made his decision to board. (David Dep.140:13–22.)

16 While Plaintiff expected to experience some discomfort during the flight, he did
17 not know the extent to which his condition could be aggravated by sitting for ten
18 hours without elevating his legs during the flight. (Pl.'s Resp. to Def.'s Interrog. No.
19 26.) Plaintiff insists that he has only flown first class over the past few decades, and
20 thus cannot speak to how carriage in an inferior cabin would affect his health. (*See*
21 David Decl. ¶ 8.) During the flight, Plaintiff did not appreciate any pain in his legs;
22 nor did he make any complaints or requests to flight attendants regarding his medical
23 condition. (David Dep. 105:12–25.) He also attests that his seat did not malfunction
24 or break during the duration of the flight. (Pl.'s Resp. to Def.'s Interrog. No. 30.)
25 After arriving in Tel Aviv, Plaintiff testifies that his legs felt swollen. (David Dep.
26 105:12–25.) Due to the swelling in his limbs and the exacerbation of his edema, he

---

27 [4] Plaintiff rejects UAL's claims that personal air travel would have been possible, as private jet
28 travel requires advanced booking and, in any event, private aircraft are not permitted to land in Israel. (David Decl. ¶ 13.)

remained in bed for the first three days of his trip and experienced discomfort for the remainder of his time in Israel. (Compl. ¶ 7.)

### B. UAL Contract of Carriage

Instead of a printed ticket, UAL issued Plaintiff an e-mail confirmation of his purchase, which provided notice to the terms in UAL's Contract of Carriage. (UMF Resp. 4.) UAL's Contract of Carriage states that "[s]eat assignments, regardless of class of service, are not guaranteed and are subject to change without notice." (UAL Contract of Carriage ("Contract of Carriage") 9, Fleming Decl. Ex. C, ECF 20-10.) The Contract of Carriage also sets forth a compensation system for passengers who are reassigned to a lower class of service. (*Id.* 38.) Passengers with round trip tickets may be reimbursed up to 50 percent of the difference between the two classes of service and only for the segment of the flight where the lower class of service is used. (*Id.* 39.) However, Rule 27(A)(3)(c) of the Contract provides that a passenger who purchases an upgrade through a combination of award points and cash is limited to recovering the amount paid in cash. (*Id.* 39.) Per UAL's standard internal procedure, passengers holding award tickets have lower priority than those who paid solely by cash, and are thus more likely to be downgraded. (Fleming Decl. ¶ 12.) Finally, passengers are notified online that they must request special accommodations for disabilities at least twenty-four hours in advance of the scheduled flight. (*Id*. ¶ 16; UAL's Requirement for Advance Notice ("Not. of Disability") 2, Fleming Decl. Ex. E, ECF No. 20-12.)

### III. PROCEDURAL BACKGROUND

Plaintiff filed his Complaint in Superior Court on January 30, 2015, seeking damages for Defendant's alleged negligence and breach of contract. (Not. Of Removal, Ex. 2, ECF 1.) Defendant subsequently removed the state action to federal court. (ECF No. 1.) On February 1, 2016, Defendant moved for summary judgment on all claims and Plaintiff timely opposed. (ECF Nos. 20, 23). Defendant timely

replied. (ECF No. 24.) Defendant's Motion is now before the Court for consideration.

## IV. LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each claim upon which the moving party seeks judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the moving party meets its initial burden, the opposing party must then set out specific facts showing a genuine issue for trial in order to defeat the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see also* Fed. R. Civ. P. 56(c), (e). The nonmoving party must not simply rely on the pleadings and must do more than make "conclusory allegations [in] an affidavit." *Lujan v. Nat'l Wildlife Fed'n*, 498 U.S. 871, 888 (1990); *see also Celotex*, 477 U.S. at 324. Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322; *see also Abromson v. Am. Pac. Corp.*, 114 F.3d 898, 902 (9th Cir. 1997). In light of the facts presented by the nonmoving party, along with any undisputed facts, the Court must decide whether the moving party is entitled to judgment as a matter of law. *T.W. Elec. Serv., Inc. v. Pac Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). When deciding a motion for summary judgment, "the interferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted); *Valley Nat'l Bank of Ariz. v. A.E. Rouse & Co.*, 121 F.3d 1332, 1335 (9th Cir. 1997). Summary judgment for the moving party

1  is proper when a rational trier of fact would not be able to find for the nonmoving
2  party on the claims at issue. *Matsushita*, 475 U.S. at 587.

## V. DISCUSSION

Plaintiff's Complaint asserts breach of contract and negligence claims and seeks compensatory damages. (Compl. ¶¶ 8, 13.) Defendant, in turn, maintains that no genuine issues of material fact exist to refute that each claim is preempted by international law.

### A. Applicability of the Montreal Convention

Defendant argues that the Montreal Convention exclusively governs this case and precludes Plaintiff from bringing claims under local law. The Court agrees.

The Warsaw Convention is a multilateral treaty adopted in 1929 to exclusively govern the rights and liabilities of a carrier in the international carriage of passengers, baggage, and cargo. *See El Al Israel Airlines, Ltd., v. Tsui Yuan Tseng*, 525 U.S. 155, 161. Its successor, the Montreal Convention, was enacted in the United States on November 4, 2003 and unifies the Warsaw Convention's liability system and retains many of its predecessor's terms and provisions. *Phifer v. Icelandair*, No. CV08-06561 ODW-CWX, 2009 WL 6635315, at *2 (C.D. Cal. Oct. 29, 2009) (Wright, J.), *rev'd on other grounds and remanded*, 652 F.3d 1222 (9th Cir. 2011) (citing *Bassam v. American Airlines*, 287 Fed. Appx. 309, 313 n.5 (5th Cir. 2008). The Montreal Convention governs the rights and liabilities of air carriers in "persons, baggage, or cargo." Montreal Convention, Art. 1(1).[5] The treaty is controlling when Plaintiff engages in "international carriage," which is defined as:

---

[5] The Convention for the Unification of Certain Rules for International Carriage by Air Done at Montreal on 28 May 1999, ICAO Doc. No. 9740 (entered into force on November 4, 2003), reprinted in Treaty Doc. 106-45, 1999 WL 33292734 (2000), hereinafter referred to as the "Montreal Convention" or "Convention."

> any carriage in which . . . the place of departure and the place of destination, whether or not there be a break in the carriage or a transhipment, are situated either within the territories of two States Parties, or within the territory of a single State Party if there is an agreed stopping place within the territory of another State, even if that State is not a State Party.

*Id.* at Art. 1(2).

Here, Plaintiff clearly engaged in international travel: he departed the territory of one State with the intent to stop in the territory of another State. It is also undisputed that Plaintiff had a round trip ticket to and from Los Angeles with a designated stop in Israel. (Fleming Decl. ¶ 8.) Moreover, Plaintiff traveled between State Parties, as both the United States and Israel are parties to the Montreal Convention. *Montreal Convention*, Int'l Civil Aviation Org. (May 28, 1999), http://www.icao.int/secretariat/legal/List%20of%20Parties/Mtl99_EN.pdf. Because Plaintiff's travel is considered "international carriage" under Article 1, the Court finds that the Montreal Convention applies to Plaintiff's claims against Defendant.

### B. Preemption of State Law Claims

Defendant next argues that the Montreal Convention also *precludes* Plaintiff from maintaining any state actions. (Mot. 11.) Plaintiff in turn argues that, while the Convention has preemptive effects, it does not compel preemption as to Plaintiff's specific contract claim, as his cause of action falls outside the scope of the Convention's liabilities. (Opp'n 7–10, ECF No. 23.) At the heart of their dispute is whether the Convention effectuates complete preemption, where all state law claims are precluded, or conflict preemption, where a state law claim is only precluded if it conflicts with the Convention's three categories of liability. This Court has previously addressed this issue, and in resolving the ambiguity has considered divergent district court decisions as well as the treaty's drafting history. *See Fadhliah v. Societe Air France,* 987 F. Supp. 2d 1057, 1063–64 (C.D. Cal. 2013) (Wright, J.). As in

*Fadhliah, id.*, the Court finds the pro-preemptive line of cases persuasive and again concludes that the Convention *exclusively* governs all claims for damages arising in international transportation of passengers.

The Convention's exclusivity provision provides that "any action for damages, however founded, whether under this Convention or in contract or in tort or otherwise, can only be brought subject to the conditions and such limits of liability as are set out in this Convention." Montreal Convention, art. 29. It provides three categories of air carrier liability: personal injury, loss of or damage to baggage, and delay. *Id.*, art. 17–19. Accordingly, under the Convention, no recovery is available for injuries falling outside these three categories.

This limitation on liability provides uniformity for carriers and Convention signatories. The Supreme Court in *El Al Israel Airlines, Ltd. v. Tseng* held that a passenger could not maintain an action for personal injury damages under local law when the claim did not satisfy the conditions of liability for personal injury relief under Article 17 of the Convention. 525 U.S. 155, 176 (1999). The Court stated that the Convention "precludes passengers from bringing actions under local law when they cannot establish air carrier liability under the treaty." *Id.* at 175; *see also Carey v. United Airlines*, 255 F.3d 1044, 1048 (9th Cir. 2001). The purpose of drawing an international treaty is to establish uniform laws for claims arising from international travel and to limit the liability of air carriers for such claims. *Id.* at 169. In light of that purpose, one "would be hard put to conclude that the delegates at Warsaw meant to subject air carriers to the distinct, nonuniform liability rules of the individual signatory nations." *Id.* Therefore, if Plaintiff cannot recover under the Convention's three categories of liability, then Plaintiff cannot recover at all.

Since *Tseng*, federal district courts have divided on the issue of complete preemption. Some read *Tseng* to mean that if recovery is not available under the Convention, it is not available at all. *Sobol v. Cont'l Airlines*, No. 05 CV 8992 (LBS), 2006 WL 2742051, at *5 (S.D.N.Y. Sept. 26, 2006). Other district courts determined

1 that the *Tseng* Court only decided the issue of conflict preemption— but not complete
2 preemption—and therefore a plaintiff may bring state claims that do not run counter to
3 remedies already available under the Convention. Plaintiff relies on the latter line of
4 cases to argue that, since the Convention does not provide relief for his contract claim,
5 the Convention therefore does not preclude recovery through a state action. *See*
6 *Nankin v. Cont'l Airlines, Inc.*, No. CV 09-07851-MMM (RZx), 2010 WL 342632, at
7 *4, *6 (C.D. Cal. Jan. 29, 2010); *Serrano v. Am. Airlines, Inc.*, CV08-2256 AHM
8 (FFMX), 2008 WL 2117239, at *3 (C.D. Cal. May 15, 2008).

9 However, the Court does not find Plaintiff's arguments to be persuasive enough
10 to merit a divergence from *Fadhliah*. In *Fadhliah*, this Court found that the Montreal
11 Convention provides the exclusive cause of action for injuries sustained in
12 international travel after a thorough analysis of *Tseng* and its progeny, as well as the
13 legislative intent in drafting the treaty. *Fadhliah*, 987 F. Supp. 2d at 1063–64. The
14 Court finds the Fadhliah argument to be more compelling and in line with the
15 Convention's need to maintain uniformity across signatory States.

16 Therefore, should Plaintiff's claims fall outside the bounds of the Convention's
17 delineated categories of liability, the Court holds those claims to be wholly
18 preempted.[6]

19 **C. Recovery Under Article 17**

20 The Court finds that Plaintiff's alleged injuries do not fall under one of the
21 Convention's three categories of liability, and are therefore wholly preempted.

22 Plaintiff claims to have sustained personal injuries from having insufficient leg
23 room on his flight to Tel Aviv. (Compl. ¶¶ 7–8.) Liability for this type of personal

---

[6] Even if *Tseng* sets forth Plaintiff's preferred conflict preemption standard, his contract claim still does not survive the summary judgment because it is premised on the same set of allegations giving rise to the negligence claim—which, as discussed below, is excludable under Article 17. *See Naqvi v. Turkish Airlines, Inc.*, 80 F. Supp. 3d 234, 240 (D. D.C. 2015) (preempting common law contract claims that are indistinct from plaintiffs' tortious theories of harm). Both Plaintiff's contract and negligence claims arise from UAL's downgrade of Plaintiff from BusinessFirst to Economy Premier/Plus. (Compl. ¶ 7, 11.) As such, the Court concludes that Plaintiff is precluded from maintaining independent state law claims, regardless of the theory applied.

injury is governed by Article 17 of the Convention, which holds an airline liable for bodily injuries caused by (1) an "accident" that occurs (2) "on board the aircraft or in the course of any of the operations of embarking or disembarking." Montreal Convention, art. 17.

### 1. "Embarking"

The Court holds as a matter of law that Plaintiff was "embarking" at the time of his injury. In determining whether the passenger was embarking or disembarking, the Ninth Circuit employs an assessment of the totality of the circumstances surrounding a passenger's injuries, such as (1) the passenger's activity; (2) the carrier's control over the passenger; and (3) the location where the incident occurred. *Maugnie v. Compagnie Nationale Air France*, 549 F.2d 1256, 1262 (9th Cir. 1977) (citing *Day v. Trans World Airlines, Inc.*, 528 F.2d 31, 33–34 (2d Cir. 1975)). Considering the factors above, the Court in *Day* held on summary judgment that, at the time of the questioned incident, passengers were in the course of embarking: they were assembled at the departure gate, ready to board the aircraft, and they were required to stand in line in accordance with the gate agent's orders. *Day*, 528 F.2d. at 33. Similarly, just prior to the the downgrade, Plaintiff stood adjacent to the departure gate and remained under the carrier's control. "Immediately prior to boarding the plane destined for Tel Aviv," the gate agent directed Plaintiff to go back the ticket counter, where Plaintiff learned of the downgrade. (Compl. ¶ 5; David Dep. 49:18–20.) Plaintiff was clearly acting under the direction of the gate agent because his compliance was necessary to timely arrive in Israel. Accordingly, in looking to Plaintiff's position adjacent to the departure gate, his restriction in movement, and his imminence to boarding, Plaintiff was in the course of embarking.

### 2. "Accident"

While the location and timing of Plaintiff's injuries fall under the purview of Article 17, the Court holds as a matter of law that Defendant's actions do not constitute an "accident" under the Convention.

An accident is an "unexpected or unusual event or happening that is external to the passenger." *Air France v. Saks*, 470 U.S. 392, 392 (1985) (determining the qualifications of an "accident" on summary judgment). "This definition should be flexibly applied after assessment of all the circumstances surrounding a passenger's injuries." *Id.* at 405. While an accident may denote the occurrence of the injury itself, drafters of the Warsaw Convention specified that air carriers would only be liable should an accident *cause* an injury, not merely where an injury has occurred. *Id.* at 398–99; *see also Phifer*, 592 F.3d at 1224.[7] As such, an injury is not caused by an accident when it results from the passenger's own "internal reaction to the usual, normal, expected operation of the aircraft." *Id.* at 406. To determine whether an event is unexpected, courts look to a "purely factual description of the events" irrespective of the passenger's subjective experience. *Krys v. Lufthansa German Airlines*, 119 F.3d 1515, 1521 (11th Cir. 1997). The Ninth Circuit has further recognized that the terms "unexpected" and "unusual" modify the event, and not the injury itself. *Phifer*, 2009 WL 6635315, at *3 (citing *Craig v. Compagnie Nationale Air France*, 45 F.3d 435, *2–3 (9th Cir. 1994).

Plaintiff cites three potential events that could be construed as Article 17 "accidents": the seat downgrade; UAL's failure to accommodate after notice of Plaintiff's medical condition; and the exacerbation of Plaintiff's edema. (Compl. ¶¶ 5, 7.) The Court finds that there are no genuine issues of material fact as to whether these events meet the objective definition of an "accident."

First, a downgrade is not an Article 17 "accident," as it is not unexpected or unusual in terms of industry standard or practice. While Plaintiff contends that the downgrade was unexpected because he has only flown first class for the past several decades (David Decl. ¶ 8), the Court reminds Plaintiff that the standard for determining whether an event was "unexpected" is an objective one, and just because

---

[7] While the Court in Saks analyzed Article 17 of the Warsaw Convention of 1929, rather than its successor, Article 17 of the Montreal Convention of 1999, which governs here, any differences are immaterial to the case at bar.

he may have been so fortunate to have never experienced a prior downgrade does not deem downgrades to be "unexpected" as a matter of law. *See Krys*, 119 F.3d at 1521. Just as being "bumped" from a flight altogether is a systematic and widely known practice, being downgraded from first class to a general population of passengers is also a routine travel procedure. *Campbell v. Air Jamaica Ltd.*, 760 F.3d 1165, 1172 (11th Cir. 2014) (holding the practice of "bumping" to be systematic and declaring there to be "nothing accidental about it."); *see also Sobol*, 2006 WL 2742051, at *4 (finding that the downgrading of a companion traveler's ticket is not an "accident" under the Convention). Moreover, Plaintiff was on constructive notice of UAL's policy because Plaintiff's electronic ticket confirmation incorporated the terms of UAL's Contract of Carriage. (David Decl. ¶ 17.) The terms of that contract explicitly state that reserved seating assignments are subject to change without any notice for any reason. (Contract 9.) Additionally, the fact that the Contract provides remedies for these circumstances indicates that downgrades are indeed possible. (*Id.* 40.) Moreover, Plaintiff's tickets were more likely to be downgraded because they were purchased with his award points, and thus are deemed lower priority in UAL's internal system. (Fleming Decl. ¶ 12.) Therefore, the Court holds that Plaintiff's downgrade was not "unexpected" and thus does not qualify as an "accident."

Second, UAL's failure to accommodate Plaintiff's request for priority seating due to his pre-existing medical condition was also not an "accident." Plaintiff contends that the gate agent's inability to assist with his requests was unexpected and unusual. (Mot. 19.) After learning of the downgrade, Plaintiff asked the agent to find a different flight leaving that night or the next day with UAL or another airline; for appropriate accommodations on the current flight in light of his disability; and for the agent to inquire whether a first class passenger would be willing to exchange seats for twice the value of the seat. (Lazenby Decl. ¶ 7; David Decl. ¶¶ 9–10.) Plaintiff further claims that he did not need to request special accommodations in advance because he purchased first class seats that already promised extended legroom.

(Opp'n 14 n.1.)

However, as is clear from above, no passenger is guaranteed a seat type, let alone a seat on a specific flight. If a passenger does require a specific seat, UAL's website provides that certain seats will be made available to passengers with a disability, so long as the airline is given at least twenty-four hours' notice prior to the scheduled flight. (Not. of Disability 2.) The Federal Aviation Regulations govern seating accommodations for disabled passengers, and Section 382.83(a)(1)(iii) echoes UAL's policy and requires twenty-four hour advance notice in order to accommodate a passenger's disability. 14 C.F.R. § 382.83(a)(1)(iii). In the absence of such notice, agents must only meet last minute requests to the extent practicable, but agents are not required to displace another passenger in order to accommodate a request. *Id.* Here, the gate agent is expected to comply with industry regulations and internal policy, and thus her inability to accommodate Plaintiff's belated requests is not unusual enough to constitute an "accident." Given the lateness of the hour and the lack of available first class seats on a later flight, the UAL agent assisted to the extent practicable by assigning Plaintiff to Economy Premier/Plus, which offered more legroom than Economy. (Fleming Decl. ¶¶ 13–14.)[8] Plaintiff's argument that the agent should have allowed Plaintiff to personally ask another first class passenger to trade his or her seat for cash is not practicable; not only does it fly in the face of UAL and FAA policy disfavoring passenger displacement, it violates the other first class passengers' privacy. Therefore, because UAL's actions conformed to industry practice, the agent's failure to accommodate Plaintiff's disability without notice cannot be construed as an "accident."

Third, the exacerbation of Plaintiff's edema is not an "accident." Defendant

---

[8] While the Court is concerned that UAL's policy for disability accommodations does not specify whether first class flyers must still request assistance in advance despite the services already available in first class, it is not a material issue in this instance. Prior to the flight, Plaintiff was not aware that his edema could be exacerbated to the extent that it did. (Pl.'s Resp. to Def.'s Interrog. No. 26.) Therefore, he likely would not have requested disability accommodations in advance, regardless of the lack of specificity in UAL's policy.

argues that the swelling in Plaintiff's legs was a bodily injury that is an internal reaction to the usual, normal, or expected operation of the aircraft. (Mot. 20.) Several courts have held that instances where passengers experienced adverse physical reactions on otherwise regularly operating flights did not constitute as "accidents." *See Saks*, 470 U.S. at 406 (concluding that passenger's hearing loss was an internal reaction in light of the aircraft's normally operating pressurization system); *Rodriguez v. Ansett Australia Ltd.*, 383 F.3d 914, 918 (9th Cir. 2004) (holding on summary judgment that plaintiff's development of deep vein thrombosis—a blood clot that may cause excessive swelling—was not an external event because the aircraft was operating under normal conditions). It is commonly known among travelers that long flights may cause circulation problems as a result of cabin air pressure and inactivity during the plane ride. Remaining inactive in a seated position for an extended amount of time will cause swelling to one's legs and feet. Sheldon G. Sheps, *What causes leg and feet swelling during air travel*, Mayo Clinic (Feb. 6, 2014), http://www.mayoclinic.org/diseases-conditions/edema/expert-answers/foot-swelling/faq-20057828; Ashley Mackenzie, *Swelling in My Leg after a Plane Ride*, Livestrong.com (Jan. 27, 2015), http://www.mayoclinic.org/diseases-conditions/edema/expert-answers/foot-swelling/faq-20057828. Even though Plaintiff typically has ample leg room in first class and is therefore less susceptible to experiencing these symptoms during air travel (David Decl. ¶ 8.), this common bodily reaction is not considered an "accident" under Article 17.

Furthermore, there is no indication that the aircraft seat in which Plaintiff traveled was broken or malfunctioning. (Pl.'s Resp. to Def.'s Interrog. No. 30.) Nor did Plaintiff sense any pain or make further requests during the flight, and thus Plaintiff cannot argue that the flight crew's response, or lack thereof, contributed to his injuries. (David Dep. 105:12–25, 108:14–21.) *See Rodriguez*, 383 F.3d at 918 (highlighting the difference between bodily injury that results from a passenger's internal reaction independent of the flight crew's involvement, and that which is

*caused* by a flight crew's failure to respond to a passengers' request for medical assistance, an event that courts deem an "accident"). Therefore, the Court holds that the exacerbation of Plaintiff's edema was an event internal to him, and thus not an "accident" as a matter of law.

Accordingly, the Court finds that none of Plaintiff's alleged injuries constitute "accidents" under Article 17, and therefore Plaintiff's state law claims are wholly preempted by the Montreal Convention.

## VI. CONCLUSION

For the above reasons, the Court holds that Plaintiff's claims are preempted as a matter of law and **GRANTS** Defendant's Motion for Summary Judgment in its entirety.

**IT IS SO ORDERED.**

April 18, 2016

_____
 **OTIS D. WRIGHT, II
 UNITED STATES DISTRICT JUDGE**